Maurice P. Schwartz
SBN 62698
315 Rheem Blvd
Moraga, CA 94556

*Counsel for Plaintiff, Ina Ann Rodman*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INA ANN RODMAN<br>　　　　Plaintiff<br><br>vs.<br><br>OTSUKA AMERICA PHARMACEUTICAL,<br>INC. AND OTSUKA AMERICA, INC. et al.<br>　　　　Defendants | CASE NO.: 3:18-cv-3732-WHO<br><br>AMENDED AND RESTATED COMPLAINT<br><br>JURY TRIAL DEMANDED |

**AMENDED AND RESTATED COMPLAINT**

**I.   INTRODUCTION**

1. The Amended Complaint of Plaintiff Ina Ann Rodman, a person of the full age of majority, domiciled and residing within the County of Contra Costa, State of California, respectfully represents:

2. Plaintiff is not aware of the names or capacities of the parties sued herein as Does 1 through 10, inclusive. Plaintiff will seek leave to amend this amended complalnt, if necessary, when she learns of the true names and capacities of said ficticiously named defendants.

**II.   PARTIES**

3. Defendant, Otsuka America Pharmaceutical, Inc. ("Otsuka America Pharmaceutical"), upon information and belief, is a corporation authorized to do business within the State of California, having its principal place of business at 2440 Research Blvd., Rockville, MD 20850, and whose registered agent for service of process in California is CT Corporation System, c/o Vivian Imperial, 818 W. Seventh St., Suite 930, Los Angeles, California 90017.

1

### III. JURISDICTION AND VENUE

4. Jurisdiction and venue are appropriate in this judicial district because the Plaintiff resides in this district, ingested the dangerous product Abilify in this district and suffers injury in this district as a result of this exposure.

### IV. FACTUAL BACKGROUND

5. The dangerous pharmaceutical product (Abilify) ingested by Plaintiff Rodman was continuously manufactured, marketed, advertised and distributed to the general public by Defendant Otsuka America Pharmaceutical, Inc. Otsuka America Pharmaceutical, Inc. has listed its principal place of business with the California Secretary of State as 2440 Research Blvd., Rockville, MD 20850. Otsuka America Pharmaceutical has been continuously doing business for profit, in Maryland, and in other U. S. jurisdictions including this judicial district. At all times herein mentioned, Defendant Otsuka America Pharmaceutical, has purposefully marketed, designed, manufactured, tested, analyzed, distributed, recommended, merchandised, advertised, promoted, supplied and sold to distributors for resale to physicians, hospitals, medical practitioners and the general public, a certain pharmaceutical product, hereinafter referred to as Abilify – also known as aripiprazole, in interstate commerce and in this judicial district.

6. At all times herein mentioned, Defendant Otsuka America Pharmaceutical was the actor engaged in the acts herein alleged, acting through its agents and employees, and at all times, the actions and omissions asserted in this pleading were committed by agents or employees acting within the purpose and scope of said agency and/or employment, and/or all of said acts and conduct were ratified and approved by said Defendant.

7. Abilify was approved by the FDA in November 2002 for the short-term treatment of schizophrenia (NDA 21-436). The manufacturer was Otsuka Pharmaceutical Co. The initial indication for the drug stated that the long-term effectiveness or efficacy of the drug had not been established. Abilify was one of

a class of atypical anti-psychotics that was marketed after the first agent, Clozaril, was marketed in 1989. Since 2002, Abilify has been approved for the following indications: longer-term treatment of schizophrenia (August 28, 2003; acute manic or mixed episodes associated with bipolar disorder (September 29, 2004); maintenance therapy in bipolar I disorder (March 1, 2005); treatment of schizophrenia in adolescents 13-17 years of age (October 29, 2007); adjunctive treatment in major depressive disorder in patients with a partial response to other antidepressant therapy (November 16, 2007); acute manic or mixed episodes associated with bipolar I disorder in pediatric patients 10-17 years of age (February 27, 2008); treatment of irritability associated with autistic disorder in pediatric patients 6-17 years old (November 19, 2009); maintenance treatment of bipolar I disorder as an adjunct to lithium or valproate (February 16, 2011); and Tourette's disorder in pediatric patients (December 12, 2014).

8. In Ms. Rodman's case, Abilify was prescribed for treatment of symptoms of depression, not for schizophrenia or bipolar disorder. When Abilify was approved by FDA in 2007 as an adjunctive treatment in major depressive disorder in patients with a partial response to other antidepressant therapy, the approval was based on efficacy data collected in two clinical studies (see *Summary Review* of NDA 21-436/S-0018 dated November 16, 2007) with less than 400 patients that were treated with Abilify as compared to placebo. The studies were both short-term studies, 6 weeks in duration. A longer-term study (26 weeks) was completed after the drug was given approval.

9. The pharmacology and adverse effects or safety concerns associated with use of aripiprazole and other anti-psychotic drugs have been described in many textbooks and review articles (*e.g., Goodman & Gilman's The Pharmacological Basis of Therapeutics, 9th through the 12th editions;* McGraw-Hill: New York, chapter on drugs used to treat psychotic disorders). Abilify is thought to produce its therapeutic and adverse effects through its activity on various receptor systems in the brain and throughout the body. Abilify is known to be an antagonist of some dopamine, serotonin, histamine and alpha adrenergic receptors, and a partial agonist at the dopamine D2 receptor and the serotonin

5HT1A receptor. This partial agonist activity was stated to be a unique feature of Abilify. However, the exact mechanism by which atypical anti-psychotic drugs such as Abilify produce their effects in schizophrenia, bipolar disorders and depression is not known (see labeling for Abilify).

10. The clinically important adverse effects of Abilify are outlined in the FDA-approved labeling. In this case, the toxicity of concern is tardive dyskinesia. Tardive dyskinesia is a serious and irreversible neurological condition that is known to be caused by anti-psychotic drugs as well as other psychiatric agents. It is defined as a neurological condition characterized by repetitive, involuntary purposeless movements typically caused by the long-term use of drugs such as Abilify. Abilify's initial product labeling, as well as current labeling, carries a class warning for tardive dyskinesia.

11. Although it was initially reported that the risk of tardive dyskinesia was greater with older anti-psychotic agents as compared to newer agents, such as those referred to as atypical anti-psychotics, this may not be the case (Tarsy and Baldessarini. 2006. Mov. Disord. 21:589-598; Caroff et al. 2011. Neurol. Clin. 29:127). In fact, the statement in a 2007 paper on the rate of movement disorders with atypical anti-psychotics as compared to typical or conventional agents (5.4% versus 0.8%; Rosenheck. 2007. Br. J. Psychiatry 191:238-245) is not supported by a review of the evidence currently available. The association of Abilify with tardive dyskinesia also has been repeatedly reported in the published literature (*e.g.,* Pena et al 2011. Mov. Disord. 26:147-152; Moseley et al. 2013. Clin. Psycopharmacol. 36:128-130; Goyal and Devi. 2014. Clin. Psychopharmacol. Neurosci. 12:69-71; Pena. 2016. Curr. Drug Saf. 11:102-103). These reports include an estimate of the incidence of tardive dyskinesia in a clinic population (Pena et al. 2011) and in patients taking the drug at doses recommended for use in patients with depression (Moseley et al. 2013.).

12. Abilify manufacturing and marketing are regulated by the FDA (21 CFR Parts 200 through 499 in particular). It is the drug manufacturer that is responsible for ensuring that its product is both safe and effective for its labeled uses. The FDA does no testing itself. This means that FDA does not conduct or monitor clinical

Case 3:18-cv-03732-WHO   Document 28   Filed 08/13/18   Page 5 of 13

trials, and does not choose the investigators or the sites. Instead, the FDA relies on companies to conduct all testing, both preclinical and clinical, and to provide the results of testing that is accurate and reliable and shows that the drug has therapeutic activity and is also safe for use in humans. FDA makes its decisions about drug approval based on the information provided by the company in its NDA.

13. In the case of human drug products, FDA regulations pertain to the approval of new drug products as well as the continued marketing of drugs once approved for human use. As already mentioned, the drug manufacturer is responsible for developing all of the data and analysis necessary to prove that the drug is both safe and effective. Drug companies have the duty to carefully monitor their drugs after approval and during marketing for either the existence of new adverse events or a higher than expected incidence of known adverse effects. In this case, the rate of occurrence of tardive dyskinesia is an issue that will be discussed in terms of the data available on Abilify that developed after the drug was first approved for use in 2002.

14. The manufacturer has the responsibility for drafting the initial labeling for their product and for assuring that the labeling continues to reflect the current knowledge concerning the risks posed by the drug (see 21 CFR 314.80). In 2015, Abilify's manufacturer, Otsuka, received a Warning Letter from FDA regarding their attempts to market Abilify as having a unique pharmacological profile and advantages over other drugs used in the treatment of bipolar disorder and depression (see Warning Letter dated April 17, 2015). The FDA stated that the available data did not support the claims made by Otsuka in their promotional materials.

15. FDA regulations also govern the reporting of adverse events that occur both during clinical testing and once a drug is marketed (post-market surveillance). Thus, the manufacturer is required to collect, monitor and report to FDA all significant developments relating to a drug product, including adverse event reports received directly by the company (postmarket surveillance; 21 CFR 314.80). An issue that is not always appreciated with respect to postmarket

5

surveillance of human drug products is the reporting rate. It is well understood that significant under-reporting of drug adverse events occurs (e.g., Scott et al. 1987; Ahmad, S.R. 2003; Goldman, S.A. 1998; Hazell, L. and S. Shakir. 2006; Murphy, S. and R. Roberts. 2006; Rodriguez, E.M. et al. 2001). In fact, it is estimated that only 1% to 10% of actual events experienced are reported (Ahmad, S.R. 2003; Goldman, S.A. 1998; Hazell, L. and S. Shakir. 2006; Murphy, S. and R. Roberts. 2006; Rodriguez, E.M. et al. 2001). Thus, the number of case reports appearing in the medical literature, in a company postmarket surveillance database, or the FDA database is not an indicator of the likelihood of any particular adverse event occurring in medical practice.

16. The labeling for prescription drug products contains warnings for physicians and patients that relate to the most serious health risks associated with use of a drug. Drug labeling is regulated in terms of what information must be included on the labeling as well as how that information is presented. An example of the regulations concerning the content of drug labeling is contained in section 352(f) of title 21 of the United States Code, which requires that a drug's labeling must contain "adequate directions for use," including a statement of all conditions, purposes, and uses for which the drug is intended. Section 352(f) also requires that a drug's labeling must contain "adequate warnings against use" when taking or administering the drug may be dangerous. In addition, section 352(a) requires that a drug's labeling have fair balance and not be false or misleading in any particular manner. If a drug's labeling does not satisfy such requirements, the drug is deemed misbranded under section 352 and may not be distributed in interstate commerce under section 331 of the United States Code. For example, a drug that is promoted for a use that has not been found to safe and effective by the FDA does not contain adequate directions for use because the unapproved use is not included in the FDA-approved labeling for the drug.

17. With respect to the patient safety information that is included in prescription drug labeling, the regulations provide specific direction as to where information is to be listed and the distinctions between the types of safety information that appear on a drug label (see 21 CFR 201.57). There are four major sections within

a drug label that relate to patient safety and that are required and described in 21 CFR 201.57 Sections (d) through (g). These sections are "Contraindications", "Warnings", "Precautions" and "Adverse Reactions". The "Contraindications" section is a listing of the most serious safety concerns where the use of the drug would result in a situation where risks clearly outweigh the benefits of the drug. The "Warnings" section of the label lists serious adverse reactions, potential safety hazards, limitations in use imposed by these events, and steps that should be taken if these events should occur. The "Precautions" section must contain a description of special care instructions to be exercised for safe and effective use of a given drug product. Typically, the "Precautions" section has information relating to, for example, laboratory tests, drug interactions, pregnancy information, and geriatric uses. The "Adverse Reactions" section of the label is a laundry list of adverse reactions, or undesirable effects that have occurred in studies before marketing and/or in studies after marketing, where the listed reactions are ones reasonably associated with the use of the drug. In addition, under Section 201.57(e) of Title 21 of the Code of Federal Regulations, it is stated that a drug's labeling *"shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved."*

## V. EXPOSURE OF PLAINTIFF INA RODMAN TO ABILIFY

18. Prior to 2010, Plaintiff was being treated for depression and anxiety. During the fall of 2010, Plaintiff's treating physician added Abilify to her medications to treat major depressive disorder. Plaintiff's treating physician continued to prescribe Abilify for Plaintiff and she continued to ingest the drug until the fall of 2015, at which time Plaintiff ceased filling prescriptions for Abilify because she could no longer afford them.

19. On or about May 19, 2016, Plaintiff was diagnosed with Tardive dyskinesia and was informed that the Tardive Dyskinesia related to her having taken Abilify.

20. As a direct, proximate and legal result of the ingestion of Abilify, Plaintiff developed abnormal movements of the mouth and has suffered substantial

personal and economic losses that prevent her from working and that will necessitate a special plan of care for the remainder of her life. Plaintiff's injuries are in a sum in excess of the jurisdictional amount required by this Court.

21. Defendant Otsuka America Pharmaceutical aggressively marketed Abilify in the United States, and in this judicial district. The defendant undertook advertising campaigns promoting the virtues of Abilify in order to induce widespread use of the product.

## VI. NEGLIGENCE; NEGLIGENT FAILURE TO WARN

22. Defendant is in violation of the California Products Liability law (and any other jurisdiction's similar provisions of law, which are plead in the alternative) under theories of strict liability and/or negligence, in the following unexclusive particulars.

23. The manufacture and marketing of Abilify was unreasonably dangerous in design with the high likelihood that the anticipated use and ingestion of Abilify would cause Tardive Dyskinesia in users such as Plaintiff.

24. The defendant failed to consider an alternative label "design" for Abilify medication that would advise patients being treated for major depressive disorder of the availability of other medications or treatment regimens that would not involve a risk of developing tardive dyskinesia.

25. At the time that Abilify was first approved by the FDA in 2002 it carried a warning for tardive dyskinesia that was a class warning, meaning that other drugs in the class of anti-psychotics carried a similar warning. Tardive dyskinesia was listed in the Abilify 2002 label in the "Adverse Reactions" section of the label and was listed as an "infrequent" adverse reaction. In 2007, when Abilify was approved for use in major depressive disorder, the label still carried a class warning for tardive dyskinesia. Even in 2010 through 2015 when Ms. Rodman was prescribed Abilify for depression, the label warning failed to specifically discuss the fact that tardive dyskinesia had been reported in patients taking Abilify, including those taking lower doses for depression.

26. Also missing from the labels in 2010 through 2015 is the discussion of the fact that the occurrence rate for tardive dyskinesia was much higher than 0.1 to 1%, the "infrequent" standard that was mentioned in the initial Abilify labeling and in the labeling in 2012 through 2014 as well. Therefore, the Abilify labeling on the drug products used by Ms. Rodman failed to adequately describe the risk of tardive dyskinesia associated with use of the drug. Failure to provide physicians with accurate and up to date information on the occurrence of tardive dyskinesia put patient health at risk.

27. Tardive dyskinesia is one of the most commonly reported adverse events with Abilify and aripiprazole use, 5% of all reports between 2000 and 2016. It was the third most frequent reported adverse event after weight gain and off label use. This incidence rate (5%) was similar to the incidence reported by Pena in 2011 in clinic experience (3.4%; Pena. 2011. Move. Disord. 26:147-152). Therefore, the fact that the Abilify label failed to mention the specific experience of tardive dyskinesia, only including the discussion as part of the class label, is an important patient safety concern. In comparison, the Abilify label lists specific rates of occurrence in section 5.6 of the label for incidences of metabolic effects. Similar information on incidence rates for tardive dyskinesia could be added to the Abilify label and provide details that would be just as informative for physicians and their patients.

28. The issue of labeling and incidence of tardive dyskinesia in patients is also important because published literature at the time had suggested that drugs such as Abilify would be less likely to produce tardive dyskinesia as compared to older anti-psychotic drugs (discussed above), and the label for Abilify reported that the incidence of tardive dyskinesia in clinical studies was no different than in placebo-treated patients (see labeling). Failure to provide specific discussion of the reported experience with Abilify was misleading. It was the manufacturer's responsibility to ensure that the Abilify label adequately defined the risk of tardive dyskinesia to patients taking Abilify, even if the labeling information provided information that was in addition to the class warning.

29. The Abilify label has never provided a discussion or instruction regarding specific methods for screening patients for tardive dyskinesia, such as AIMS (Abnormal Involuntary Movement Scale). Use of AIMS is a standard method used by psychiatrists when screening patients for the development of symptoms of tardive dyskinesia, and also is used in the development of drugs and when FDA is making decisions about drug approval (e.g., see FDA approval documents for various anti-psychotic drugs). In fact, in the case of Abilify, FDA required the manufacturer to include AIMS as part of clinical testing for Abilify (see JEN156442). As early as 1986, the scientific literature described the use of AIMS when screening for tardive dyskinesia (Munetz and Schulz. 1986. J. Clin. Psychiatry 47:75-77). Given the fact that Abilify was used to treat chronic conditions such as schizophrenia, bipolar disorder and depression, a description of the AIMS test as a method for screening patients for tardive dyskinesia would have provided important safety information for physicians. Also given the fact that AIMS testing is a well-accepted method and was used in clinical testing with Abilify, failure to mention its use in the label meant the label failed to provide physicians with adequate information on how to readily detect the signs and symptoms of tardive dyskinesia. The lack of the reference to AIMS in the label put patient health at risk.

30. The Abilify label was defective and/or inadequate in that it did not accurately reflect the incidence and risk of developing Tardive Dyskinesia.

31. Defendant failed to consider an alternative design of the Abilify label that would accurately report the actual risk of developing Tardive Dyskinesia and Defendant was in possession of this data.

32. Defendant failed to adequately conduct tests and trials of Abilify, resulting in an inaccurate assessment of the incidence and risks of developing Tardive Dyskinesia.

33. The burden on Defendant in adopting the alternative designs noted above and which may be uncovered through discovery, is outweighed by the likelihood and gravity of the damage patients could have sustained by ingesting Abilify.

34. This design defect made Abilify unreasonably dangerous for use by patients.

35. In evaluating whether there is a design defect that renders a product unreasonably dangerous, an adequate warning about a product may be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

36. The warning on the Abilify label and in the marketing materials created by Defendant, was inadequate in that in did not accurately warn health care providers and/or patients/end-users of the incidence and actual risks of developing Tardive Dyskinesia from the ingestion of Abilify.

37. Defendant failed to warn of dangers known or reasonably scientifically knowable of Abilify at the time of manufacture and distribution as evidenced by FDA correspondence recommending various safety assessments, including the Abnormal Involuntary Movement Scale (AIMS).

38. The manufacture and marketing of Abilify was also unreasonably dangerous because an adequate warning about the product had not been provided at the time Plaintiff was prescribed Abilify, and to this day the warnings are inadequate to inform users of the inherent danger involved in taking the medication, including the onset of Tardive Dyskinesia, all as more particularly described above.

39. Defendant failed to warn of the dangers of continuous use to a reasonable user of Abilify such as Plaintiff Ina Ann Rodman.

40. Plaintiff alleges that defendant failed to properly warn of the actual danger of developing Tardive Dyskinesia and further failed to outline the appropriate procedures and periodic testing, including administering the AIMS (Abnormal Involuntary Movement Scale) test, which would alert health care providers, as to the development of Tardive Dyskinesia, a debilitating, permanent and untreatable disorder.  If defendant had properly warned of the severity and the actual risk of Tardive Dyskinesia, of the importance of properly monitoring patients taking Abilify to prevent the onset of Tardive Dyskinesia, and informed health care providers of what periodic monitoring tests were necessary, Plaintiff would not have contracted Tardive Dyskinesia.

29. At all times Plaintiff, Ina Ann Rodman, used Abilify as set forth by her physician, constituting "reasonably anticipated use" and/or "normal use."

30. Had Defendant adequately warned of the appropriate incidence of tardive dyskinesia among patients ingesting Abilify, Plaintiff's treating physician would have used an alternate treatment regimen and/or an alternate medication and altered the manner in which he monitored the patient for tardive dyskinesia;

31. Had Defendant advised treating physicians to use the AIMS test to monitor for the occurrence of tardive dyskinesia, Plaintiff's treating physician would have followed the label instruction and monitored Ms. Rodman for the occurrence if tardive dyskinesia.

### VII. DAMAGES

32. Plaintiff has suffered and incurred economic damages, including medical expenses, expenses in connection with the purchase of the product at issue, and long term care expenses.

33. Plaintiff has suffered injuries and damages as alleged herein and below, and has incurred attorney's fees for which Plaintiff is entitled to recover from Defendant.

34. As a result of developing Tardive Dyskinesia from her use of Abilify, Plaintiff has suffered damages for which she seeks compensation, including but not limited to:
    a) Medical expenses, past, present and future – in an amount to be shown at the trial of this matter;
    b) Lost wages, past, present and future – in an amount to be shown at the trial of this matter;
    c) General damages, including pain and suffering, mental anguish, etc. – in an amount to be shown at the trial of this matter;
    d) Attorney's fees and court costs.

### VIII. PRAYER FOR RELIEF

35. Accordingly, Plaintiff, Ina Ann Rodman, prays for damages reasonable on the premises for the above losses and damage.

36. Wherefore, Petitioner, Ina Ann Rodman, prays that this Petition for Damages be filed; that defendant, Otsuka America Pharmaceutical, Inc., be notified, cited, and ordered to appear and answer these allegations; that after all due proceedings shall be had, that there be judgment in favor of Petitioner and against defendant

in amounts reasonable in the premises, together with judicial interest from the date of the filing of this petition until paid in full; and for all costs of these proceedings for the reasons set forth hereinabove; together with all other general, equitable and just relief with justice that this cause may demand.

## IX. JURY DEMAND

37. Plaintiff Ina Rodman demands a jury trial on all issues so triable.

Dated: July 27, 2018            By:   *s/Maurice P. Schwartz*

                                            Maurice P. Schwartz
SBN 62698
315 Rheem Blvd
Moraga, CA 94556